```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____          │
│ DATE FILED: 2/25/15         │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

JOSE REYES,                              :

                         Plaintiff,      :         **REPORT AND
                                                   RECOMMENDATION TO
          -against-                      :         THE HONORABLE
                                                   WILLIAM H. PAULEY III**

CAROLYN COLVIN, ACTING                   :
COMMISSIONER OF SOCIAL SECURITY,                   13cv3464-WHP-FM

                                         :

                         Defendant.
-------------------------------------------------------X

**FRANK MAAS**, United States Magistrate Judge.

          Plaintiff Jose M. Reyes ("Reyes") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), seeking

review of a final decision of the Commissioner ("Commissioner") of the Social Security

Administration ("SSA") denying his application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). The parties have filed cross-motions

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure. For the reasons set forth below, I recommend that Reyes' motion, (ECF No.

20), be denied, and that the Commissioner's cross-motion, (ECF No. 25), be granted.[1]

I.     Background

          A detailed recitation of the non-medical and medical evidence may be

found in the Commissioner's memorandum of law (ECF No. 26 ("Def.'s Mem")). In

---

          [1]     ECF No. 20 is Reyes' memorandum of law ("Pl.'s Mem."). Reyes did not file a
formal notice of motion.

brief, Reyes was born on April 6, 1957, making him fifty-four years old at the time of the

hearing.  (R. 43, 116).[2]  He attended school through the tenth grade, and subsequently

earned his GED.  (Id. at 44).[3]  At the time of the hearing, he lived with his daughter and

had a girlfriend.  (Id. at 43, 51-52).  Reyes previously had worked as a hotel check-in

clerk, a restaurant supervisor, and a hospital housekeeping supervisor.  (Id. at 45-46, 154,

174).  His most recent work, as a limousine driver, ended in mid-January 2009, and he

has not worked since that time.  (Id. at 42-43, 45).

   Reyes alleges that he is disabled because of severe chronic back, neck and

spine pain stemming from two auto accidents in 1992, pinched nerves, and bipolar

disorder.  (Id. at 47, 51, 70, 153).  He also suffers from early-stage anal cancer, which was

successfully treated with laser removal, and hepatitis C, which he treated with weekly,

self-administered interferon injections and daily medication.  (Id. at 53-55).

   On June 2, 2010, Reyes filed applications for DIB and SSI, alleging a

disability onset date of February 1, 2008.[4]  (Id. at 116-24).  After his application was

---

[2]  "R." refers to the certified copy of the administrative record.  (ECF No. 16).

[3]  Reyes informed at least one provider that he had completed a year of college.  (Id. at 367).

[4]  The date Reyes actually stopped working as a limousine driver is unclear.  He initially claimed his onset date was February 1, 2008, and that he had worked until September 1 of that year.  (Id. at 13, 43, 140).  At the hearing, he amended both dates to January 15, 2009.  (Id. at 45).  One day after the hearing, Reyes's counsel notified the ALJ that Reyes, in fact, believed his last day of work was in January 2008, and he requested that Reyes' onset date remain February 1, 2008.  (Id. at 204).  Despite that request, the ALJ found that Reyes had worked until January 15, 2009, because that date was corroborated by other record evidence. (Id. at 13-14; see also id. at 174, 659).

denied initially on October 28, 2010, Reyes requested a hearing before an ALJ.  (Id. at

65-69, 74-76).  On September 6, 2011, Reyes and his then-attorney appeared before ALJ

Kenneth Scheer for that hearing.[5]  (Id. at 41-62).  On October 19, 2011, the ALJ found

that Reyes was not disabled.  (Id. at 8-27).  The ALJ's decision became the final decision

of the Commissioner on April 26, 2013, when the Appeals Council affirmed his decision.

(Id. at 1-7).  Reyes then commenced this action on May 22, 2013.  (ECF No. 2).  The

parties subsequently cross-moved for judgment on the pleadings.  (ECF Nos. 20, 25).

II.    Standard of Review

          Under Rule 12(c), judgment on the pleadings is appropriate when the

material facts are undisputed and a party is entitled to judgment as a matter of law based

on the contents of the pleadings.  See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d

639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14

(S.D.N.Y. 1999).

          The Act, in turn, provides that "[t]he findings of the Commissioner of

Social Security as to any fact, if supported by substantial evidence, shall be conclusive."

42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v.

Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the

evidence be overwhelming, but it must be "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

---

[5]          At the hearing, Reyes was represented by the Binder & Binder law firm.  (Id. at
42, 74).  To prosecute this appeal, Reyes has retained Herbert S. Forsmith, Esq.  (ECF No. 18).

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

III.    Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "[W]hether a claimant is disabled or unable to work is a matter reserved for the Commissioner." Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL 1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527). In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920.

The Second Circuit has described this familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008). The claimant bears the burden of proof with respect to the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the claimant sustains their burden at each of these steps, then the burden shifts to the Commissioner at step five. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). When reviewing the medical

5

evidence, the ALJ has the authority to select among conflicting opinions.  Veino, 312 F.3d at 588; see also Richardson, 402 U.S. at 399.  Thus, if there are genuine conflicts within the evidence, their resolution is a matter committed to the Commissioner's discretion.  See Dwyer v. Astrue, 800 F. Supp. 2d 542, 550 (S.D.N.Y. 2011) (citing Veino, 312 F.3d at 588).

IV.    ALJ Decision

In his written decision, the ALJ found at Step One of the required analysis that Reyes had not engaged in substantial gainful activity for the requisite period notwithstanding his employment between July 2008 and January 2009.  (R. 13).  At Step Two, the ALJ concluded that Reyes' lower back and neck pain, hepatitis C, and mood disorder each constituted a severe impairment, but that his anal cancer did not.   At Step Three, the ALJ found that Reyes' impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id. at 14-16).  At Step Four, the ALJ concluded that Reyes had the residual functional capacity ("RFC") to perform "light work."  (Id. at 16).  Finally, at Step Five, the ALJ found that Reyes had the RFC to perform his "past relevant work as a limousine driver, front desk clerk, and restaurant supervisor," observing that he could "perform the job of limousine driver as actually performed, and the other jobs as actually and generally performed, in the national economy."  (Id. at 22).

6

V.   Discussion

The central question presented by the cross-motions is whether the ALJ's decision that Reyes was not disabled within the meaning of the Act between January 15, 2009 (when he last was employed), and October 19, 2011 (when the ALJ issued his decision), is legally correct and supported by substantial evidence. In his papers, Reyes challenges the ALJ's decision on three grounds, alleging that the ALJ: (a) failed to develop the record adequately; (b) erred in assessing Reyes' RFC; and (c) erred in assessing Reyes's credibility. None of these claims withstands scrutiny.

A.   Duty to Develop the Record

Reyes' first claim is that the ALJ failed to develop the record adequately. "Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted). An ALJ's failure to develop the record adequately is consequently an independent ground for vacating the ALJ's decision and remanding the case. Id. at 114-15.

When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information. Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d

330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. §§ 404.1512(e), (e)(1)).[6]  In such instances,

the ALJ may request from the medical source copies of the claimant's medical records, a

new report, or a more detailed report.  Jimenez v. Colvin, No. 11 Civ. 4599 (DRH), 2013

WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013).  At the time the hearing was held, the

ALJ's duty was not limited to circumstances in which there was a gap in the record, but

also extended to those in which "the report from [a claimant's] medical source

contain[ed] a conflict or ambiguity that must be resolved . . .  or [did] not appear to be

based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R.

§ 404.1512(e)(1) (2010).  The regulation has since been modified, effective March 26,

2012, to delete the quoted language.  See Walker v. Colvin, No. 12 CV 116S, 2013 WL

5487443, at *3 n.4 (W.D.N.Y. Sept. 30, 2013).[7]  Nevertheless, even before the scope of

the ALJ's obligations changed, "the duty to develop the record extend[ed] only with

respect to the 12-month period prior to the 'filing date of the claimant's application for

benefits.'"  Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010)

(citing 20 C.F.R. § 404.1512(d)).

        Reyes contends that the ALJ failed to develop the record fully because he

failed to recontact Reyes' treating physicians to (1) determine whether the limited

functioning Reyes testified to "ha[s] been observed or could be expected, during the

---

[6]        20 C.F.R. § 404.1512(e) is currently codified at 20 C.F.R. § 404.1512(d).

[7]        The Commissioner's memorandum assumes that the earlier version of the
regulation remains applicable here.  (See "Def.'s Mem.").  Accordingly, I have made the same
assumption in addressing Reyes' claim.

relevant period and why," and (2) "obtain clarification of . . . ambiguities" inherent in the

Global Assessment of Functioning ("GAF") scores assigned to him by various physicians.

(Pl.'s Mem. at 5; ECF No. 27 ("Pl.'s Reply") at 1).

   This therefore is not a case in which the claimant contends that there are

obvious gaps in the medical record that the ALJ failed to fill.  Reyes testified that

beginning in May 2009, he received most of the treatment for his physical ailments at

Doctors Medical Group ("DMG"), where his providers included Drs. Sally Abouel-Ela

(who addressed his back, neck and leg problems), and Henry Sardar (who helped him

with pain management).  (R. 48-50, 156).  Reyes also testified that in May 2009, he began

receiving psychiatric treatment at Federal Employment and Guidance Service ("FEGS")

from Dr. Manuel Lopez-Leon.  (Id. at 60, 157).  All of the records of Reyes' treatment at

both facilities – along with records from other occasional providers – were before the

ALJ.  (Id. at 282-336, 350-886, 890-91, 896-90).  That record is extensive and includes

materials reflecting Reyes' treatment from January 2005 to March 2013.  Indeed, even

now, Reyes does not contend that he received care during the relevant period from any

source that was not contacted.

   Reyes nonetheless argues that the ALJ had an obligation to recontact his

treating physicians to obtain their opinions concerning Reyes' functional limitations

during the relevant period.  (Pl.'s Mem. at 5; Pl.'s Reply at 2).  This contention is flat

wrong.  "[T]he lack of [a] medical source statement" setting forth what a claimant "can

still do despite [his] impairments . . . will not make [a medical] report incomplete."  20

C.F.R. § 416.913(b)(6).  In any event, even if such information were necessary, the

medical records in this case contain contemporaneous statements from Reyes' treating

physicians setting forth their opinions concerning Reyes' ability to work in light of his

physical and psychological conditions.  (See R. 309, 744, 749, 889 (DMG assessments of

the effect of Reyes' physical limitations on his ability to work); id. at 392, 470, 610, 625,

818 (FEGS assessments of the effect of Reyes' psychological conditions on his

functioning and ability to work)).  As the Second Circuit recently has noted, it is

"inappropriate to remand solely on the ground that the ALJ failed to request medical

opinions in assessing residual functional capacity" when the record "include[s] an

assessment of [a claimant's] limitations from a treating physician."  Tankisi v. Comm'r of

Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013).  Consequently, even under the regulations

which were then in effect, the ALJ had no obligation to recontact Reyes' treating

physicians for an RFC assessment.

    Reyes' also maintains that the record was not fully developed because the

GAF scores that various physicians assigned to him are ambiguous.  The GAF scale is a

numeric scale ranging from 0 to 100 that clinicians formerly used to rate a patient's

social, occupational, and psychological functioning.  See Am. Psychiatric Ass'n,

Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000)

("DSM-IV-TR").  The scale was introduced in the revised version of the DSM's third

edition, id. at 12 (3d ed., rev. 1987), but was removed from the most recent edition, which

was released in 2013, id. at 16 (5th ed. 2013) ("DSM-5"). While use of the GAF scale has

been discontinued, it remained in effect throughout the time of Reyes' treatment.  As the Commissioner impliedly concedes, Reyes' GAF scores therefore are appropriately considered here.  (See Def.'s Mem. at 21-22).

Contrary to Reyes' contention, Reyes' GAF scores are not inherently ambiguous.  "Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning."  DSM-IV-TR at 32.   Here, Reyes' GAF ratings moved back and forth between scores of 50 and scores greater than 50.  A score of 41 to 50 on the GAF scale reflected "serious symptoms," while a score of 51 to 60 reflected "moderate symptoms."[8]  Id. at 34.  In May 2010, Reyes was initially assessed with a GAF of 50.  (R. 392).  In June and August 2010, Reyes' GAF was 55.  (Id. at 593, 626, 844).  In October 2010 and March 2011, Reyes' GAF again was assessed at 50.  (Id. at 610, 617).  In August 2011, Reyes' GAF was 52, and in September 2011, it was 57.  (Id. at 816, 818).  In short, between May 2010 and September 2011, Reyes was assessed with a GAF of 50 three times, and with a GAF somewhat greater than 50 four times.  The fact that Reyes' scores spanned two ranges does not render the GAF findings ambiguous.  Rather, it simply illustrates that Reyes' psychological symptoms and functioning were assessed over time as generally moderate but bordering on serious.  Moreover, there was nothing inherently improper in the ALJ's decision to refer to the GAF scores.  Indeed,

---

[8]     "Serious symptoms" include "suicidal ideation" and "any serious impairment in social, occupational, or school functioning," such as "no friends" or inability to keep a job. DSM-IV-TR at 34.  "Moderate symptoms" include "flat affect and circumstantial speech" and "moderate difficulty in social occupational, or school functioning," such as "few friends" or "conflicts with peers or co-workers."  Id.

courts in this Circuit have continued to rely on GAF scores despite the discontinuance of that rating system.  See, e.g., Phoenix v. Colvin, No. 14 Civ. 4164 (AJP), 2015 WL 451016, at *16 (S.D.N.Y. Feb. 4, 2015); Butler v. Colvin, No. 3:13-CV-00607 (CSH), 2014 WL 7338856, at *18 (D. Conn. Dec. 22, 2014); Brown v. Colvin, No. 13-CV-1073-JTC, 2014 WL 7272964, at *5 (W.D.N.Y. Dec. 18, 2014).

In sum, because the ALJ properly fulfilled his obligation to develop the record in this case, a remand on that basis is not appropriate.

B.     ALJ's RFC Determination

Reyes' second contention is that the ALJ's RFC finding was improper and is not supported by substantial evidence.  (Pl.'s Mem. at 4-6).  As the applicable regulations recognize, a claimant's "impairment(s), and any related symptoms such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting."  20 C.F.R. § 404.1545(a)(1).  A claimant's RFC represents "the most [the claimant] can still do despite [his] limitations."  Id.

1.     Relevant Facts

At the hearing, Reyes testified that he could walk for only one-half block at a time, and could not "straighten [his] body" after sitting for more than five minutes, stand for more than five minutes without experiencing back pain, or carry objects weighing more than five or ten pounds, and that he "drop[ped] everything" due to cramps and pain in his fingers caused by pinched nerves in his wrists.  (R. 52-53, 57).  He claimed that he consequently could not do the dishes or manipulate small objects, and that

he had trouble tying his shoes.[9]  (Id. at 58).  Reyes also reported experiencing severe pain, fatigue, weakness, loss of appetite, vomiting, and nausea as a result of his interferon treatment.  (Id. at 55-56).  Turning to his mental state, Reyes testified that he experienced hallucinations in the form of premonitions, and also suffered from depression, difficulty interacting with people, and self-imposed isolation.  (Id. at 58-60).

Despite this testimony, the ALJ concluded that between January 15, 2009, and October 19, 2011, Reyes retained the RFC to perform light work.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  Even though the weight to be lifted may be "very little," a job still falls within this category if it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  The ALJ found in that regard that Johnson's ability to perform light work was circumscribed as follows:

> The claimant can lift and/or carry up to 10 pounds frequently and 20 pounds occasionally, stand and/or walk up to 6 hours, and sit up to 6 hours in an 8-hour workday.  In addition, the claimant can perform all mental work activities, which include the ability to: understand, remember and carry out simple and complex instructions; use judgment; respond appropriately to supervision, coworkers and usual work situations; and deal with changes in a routine work setting.

(R. 16).

---

[9]      It is unclear whether Reyes' trouble tying his shoes was due to difficulty manipulating the laces or difficulty in bending to reach his shoes.  (See R. 58).

13

Citing Social Security Ruling ("SSR") 96-8p,  Reyes argues that the ALJ's RFC analysis is inadequate because he "did not explain function by function . . . how the probative evidence showed that [Reyes] remained capable of performing the demands of light or other work," and also failed to "refer in detail to the probative evidence in support of each of his assessments" and his ultimate RFC determination.  (Pl.'s Mem. at 5).  He also contends that the ALJ's "evidentiary references tended to be of the 'cherry picking' type."  (Pl.'s Reply at 2).  In view of these claims, the evidence that the ALJ set forth with respect to Reyes' physical and mental condition must first be set forth in some detail.[10]

  i. <u>Reyes' Physical RFC</u>

  a. <u>Treating Sources</u>

As the ALJ noted, and Reyes apparently does not dispute, the record is devoid of any evidence that Reyes had any back pain prior to late 2009.  Indeed, in January 2009, he reported to a DMG physician that he was driving sixteen hours per day. (R. 659; <u>see also</u> <u>id.</u> at 174).  On December 20, 2009, however, Reyes went to the emergency room at Montefiore Medical Center, complaining that he had experienced lumbar back pain over the past four days, a condition that he also said had existed since 1992.  (<u>Id.</u> at 266-67).  Imaging revealed that he had multilevel disc bulges and disc space

---

   [10] In certain instances where the ALJ has cited to particular medical visits, I have set forth record-based information that differs slightly from the ALJ's own summary.  Also, I have not included any detailed discussion of Reyes' treatment for hepatitis C or anal cancer since Reyes has not suggested that these conditions contributed to his alleged disability.

narrowing.  (Id. at 274, 765).  Reyes described tingling in his lower extremities.  He was

prescribed  Motrin, Valium, and one dose of Percocet upon discharge.  (Id. at 271, 275).

On February 3, 2010, Reyes visited DMG complaining of neck pain and

muscle spasms of his left neck during the previous two weeks.  He also indicated that he

"had been lifting weights recently."  (Id. at 293).  Upon examination, Dr. Abouel-Ela

found that Reyes had a "severe spasm" of the left side of his neck muscles with pain

radiating to his left shoulder and arm.  (Id.).  Dr. Abouel-Ela further noted that Reyes'

demeanor was comfortable, and his skull and spine were normal, as were his bones and

joints.  (Id. at 294).  Neurologically, Reyes was normal.  (Id.).  Reyes was "advised to rest

with warm compresses to [his] left neck region," and he was prescribed Naprosyn,

Prilosec and Zanaflex.  (Id.).  Imaging of Reyes' left shoulder and cervical spine revealed

a normal left shoulder, but mild disc narrowing at C5-C6 and C6-C7, and loss of normal

cervical lordosis.  (Id. at 296).

When Reyes was reexamined on March 19, 2010, Dr. Abouel-Ela again

prescribed Percocet and Zanaflex.  (Id.)  Also, a DMG employee prepared a note which

stated that Reyes was "unable to work until further notice due to the possibility of pinch

[sic] nerves."[11]  (Id. at 309).  Reyes next was examined on May 5, 2010, at which time he

appeared restless and showed tenderness of the lower spinal region.  (Id. at 296-97).[12]

_____

[11]     It is unclear to whom this note was directed since Reyes claimed he was not
working during this time.

[12]     The ALJ inaccurately describes this as a visit on May 9, 2010, which is the date
(continued...)

Reyes' muscle strength was 5/5.  (Id.).  On May 19, 2010, Reyes similarly had lower back tenderness and stiffness.  (Id. at 300).  Imaging studies performed on June 7, 2010, showed degenerative changes and disc protrusions and herniations at several levels of the cervical spine, disc narrowing, and multilevel spondylodegenerative disc disease and spondylosis of the lumbar spine.  (Id. at 321-27).[13]  Consistent with these imaging results, during a follow-up examination on June 21, 2010, Dr. Abouel-Ela diagnosed Reyes with lower back pain.  (Id. at 681).  Similarly, on August 2, 2010, Reyes reported "low back pain radiating to both legs."  Dr. Abouel-Ela noted that Reyes had tenderness of the lower spine area, and that the positive result of his straight leg raising test was greater on his right side.  (Id. at 683-85).

On August 13, 2010, Dr. Abouel-Ela signed a letter to the Apex Technical School which indicated that Reyes was "being treated for several serious chronic conditions" and thus was "unable to work for at least one year."  (Id. at 749).  It appears that this may have been prepared in furtherance of Reyes' efforts to defer his repayment of a student loan.  (See id. at 743-44 (temporary disability deferment request); see also id. at 888-89 (October 2010 total disability discharge request)).

---

[12](...continued)
that Dr. Abouel-Ela electronically signed his notes.  (See id. at 296-98).  The ALJ also indicated that Reyes had reported "some improvement in his neck" during this visit.  (Id. at 18).

[13]     The ALJ refers to an MRI of Reyes' cervical spine on June 14, 2010, but this appears to have been taken on June 7, 2010.  (See id. at 321-22).

On September 8, 2010, Reyes followed-up with Dr. Abouel-Ela at DMG, and reported no musculoskeletal or psychiatric complaints. (Id. at 686-87). Nevertheless, Dr. Abouel-Ela's diagnoses of Reyes included lower back pain, and he again was prescribed Percocet. (Id. at 688). On September 15, 2010, Reyes' neck, spine, bones, and joints were normal, but Dr. Haq Salman indicated that Reyes could not complete a stress test due to arthritis. (Id. at 690). On October 15, 2010, when Reyes began interferon treatments for hepatitis C, he reported that he still had "occasional neck and back pain." (Id. at 691-93). On October 20, 2010, Reyes presented with pain in the cervical spine and lumbosacral area. Dr. Abouel-Ela again diagnosed Reyes as having lower back pain, and prescribed Percocet and a neck brace. (Id. at 695).

On December 7, 2010, when Reyes sought pain medication during his interferon treatment, he was diagnosed with a lumbar intervertebral disc abnormality without myelopathy and lower back pain, and was treated with Percocet. (Id. at 697). On January 26, 2011, Dr. Abul Faiz Ahmed of DMG found that Reyes had an intact range of motion in his joints and no local tenderness. (Id. at 706). Dr. Ahmed, however, assessed Reyes as having pain in his cervical spine and joints, referred him for nerve root impingement, and advised him "not to be dependent on narcotics for his pain." (Id.). Dr. Ahmed also found that Reyes had an intact range of motion in his joints and no local tenderness on February 25, 2011, but Reyes reported neck pain and "pain all over [his] body" from his interferon injections. (Id. at 707).

17

On March 9, 2011, Dr. Henry Sardar examined Reyes.  (Id. at 811-13).
Reyes complained of continuous, "chronic low back pain radiating down to his bilateral
lower extremities with positive numbness and tingling," which he had been treating with
physical therapy, anti-inflammatory medications, and Percocet.  (Id. at 811).  Reyes was
able to "ambulate independently without assistive devices," to "stand on toes and heels,"
and had a normal gait and good "static and dynamic sitting and standing balance."  (Id. at
812).  Upon examination, Dr. Sardar found "positive decrease of the range of motion in
all planes" of Reyes' cervical spine, along with "significant muscle spasm, taut muscle
bands, and tenderness on the cervical paraspinal region bilaterally."  (Id.).  Reyes'
thoracic spine showed "symmetrical posture with no signs of significant scoliosis or rib
rotations."  (Id.).  While there was decreased range of motion and a sign of positive
impingement in the bilateral shoulder, there was "functional range of motion" in "the rest
of the upper extremities" including "the bilateral elbows, forearm, wrists and fingers,"
and "[n]o signs of joint effusion, deformity, dislocation, subluxation, or contractures."
(Id.).  Reyes' grip strength was 4/5.  (Id.).  Finally, his range of motion in the lumbar
spine was decreased, but there was "functional range of motion of the hips bilaterally,
ankles bilaterally, [and] no sign of joint instability or subluxation" or muscle atrophy.
(Id.).  Dr. Sardar's assessment was myalgia, muscle spasm, neck pain, cervical and
lumbar radiculopathy, right and left shoulder impingement syndrome, and low back pain.
(Id. at 813).  Reyes was put on a physical therapy treatment plan and given trigger point
injections.  (Id.).

18

An electrodiagnostic study on March 30, 2011, was positive for median nerve neuropathy affecting sensory-only branches on the right side.  In the absence of evidence of abnormalities, Dr. Sardar considered this "suggestive but not conclusive of bilateral S1 lumbar radiculopathies."  (Id. at 814).  Dr. Sadar also noted that x-rays of Reyes' knees on May 27, 2011, revealed "no evidence of fracture, dislocation or effusion," and were generally "unremarkable."  (Id. at 810, 814).

b.     Consultative Examinations

On August 16, 2010, Dr. Sharon Revan performed a consultative examination of Reyes.  (Id. at 354-58).  Dr. Revan noted that Reyes' back pain varied, but radiated to his legs, shoulders and the back of his head, and was "better with medication" but "worse with standing or sitting for long and walking two or three blocks."  (Id. at 354).  Dr. Revan also noted herniated and bulging disks, pinched nerves, and disc narrowing in Reyes' spine.  (Id.).  A cervical spinal x-ray revealed mild degenerative spondylosis and moderate straightening.  (Id. at 359).  Upon physical examination, Reyes was not in acute distress, had a normal gait and stance, and could walk on his heels and toes without difficulty and without assistive devices.  (Id. at 355).  Reyes could get on and off the exam table, and rise from a chair without difficulty.  (Id.).  Reyes' cervical spine "show[ed] full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally."  (Id. at 356).  His lumbar spine "show[ed] flexion 60 degrees, full lateral flexion bilaterally, and full rotary movement bilaterally."  (Id.).  Straight leg raising was "positive to 60 degrees bilaterally," and Reyes had full range of motion of his shoulders,

19

elbows, forearms, hips, knees and ankles, and his joints were "stable and nontender."

(Id.).  Reyes had no sensory deficit, 5/5 strength in his upper and lower extremities, and

showed no muscle atrophy.  (Id.).  He also had 5/5 grip strength in his hands, and his

"[h]and and finger dexterity [was] intact."  (Id. at 357).  Dr. Revan's diagnoses included

low back and neck pain, hepatitis C, anal cancer, bipolar disease, and depression and

anxiety, with a "fair" prognosis.  (Id.).  Based on her examination, Dr. Revan concluded

that Reyes' conditions caused no limitation in his speech, vision, or hearing, and no

limitation in his "upper extremities for fine and gross motor activity."  (Id.).  She found

"mild limitations," however, with respect to walking distances, standing or sitting for

long due to his back pain, "climbing stairs due to fatigue," and activities of daily living.

(Id.).

On October 28, 2010, a disability analyst assessed Reyes' RFC and

concluded that Reyes could perform light work, notwithstanding his diagnoses of anal

cancer, lower back and neck pain and hepatitis C, including occasionally lifting and/or

carrying up to twenty pounds and frequently lifting and/or carrying up to ten pounds, and

that he could both sit and stand for about six hours in an eight-hour workday.  (Id. at 445-

50).  This assessment was based largely on the results of multiple imaging studies and Dr.

Revan's conclusion that Reyes' functioning was only mildly limited.  (Id. at 446, 449).

ii.     Reyes' Mental RFC

a.     Treating Sources

Reyes has a history of depression and suicidal ideation including three

suicide attempts.[14]  (Id. at 372-73, 455, 512).  He also has reported a history of visual

hallucinations – in the form of premonitions – with the last occurring in 2001.  (Id.

at 373).  Reyes previously abused drugs, but has been clean since 1988.  (Id. at 371; see

also id. at 597).

In May 2010, Reyes was evaluated at FEGS, where a social worker

assessed him as severely depressed after he reported that he found it "extremely difficult"

to "work, take care of things at home, [and] get along with other people."  (Id. at 374).

Reyes, however, was only moderately impaired in his ability to follow work rules, accept

supervision, deal with the public, maintain attention, relate to co-workers, and adapt to

change and stressful situations.  (Id. at 392).  He was normal in his reading and writing

ability, as well as in abstraction, was able to spell words backwards after five minutes,

and appeared cooperative and happy in his mood.  (Id. at 391).  Reyes was assigned a

GAF of 50, determined to be suffering from bipolar disorder and social phobia, and found

"[t]emporarily disabled from work by reason of his mental condition," but likely to be

_____

[14]     It is unclear when Reyes last attempted suicide.  (Compare R. 582, 584 (last
attempt reported to be in 2005), with id. at 372-73 (last suicide attempt reported to be in 1986)).

able to return in three months if treated.  (Id. at 392).  The social worker determined that Reyes required outpatient psychiatric treatment before a functional capacity determination could be made.  (Id. at 392, 409).

During treatment at FEGS in June 2010, Reyes was assessed as suffering from mood disorder and anxiety disorder.  (Id. at 401).  At a June 10, 2010 assessment, Reyes presented as depressed.  (Id. at 594).  He nevertheless dressed and behaved appropriately and was cooperative and alert.  (Id. at 595).  Reyes reported that when he was a small child, his mother caught a babysitter touching him inappropriately, and that his uncle's wife and his stepfather had been abusive.  (Id. at 602).  Reyes showed poor concentration, judgment and short-term memory, normal orientation, and good intellectual functioning.  (Id. at 596).  Based on his thoughts of suicide, Reyes was assessed as a moderate risk for near-term harmful behavior.  (Id. at 597; see also id. at 603).  Reyes showed high motivation for treatment, insight into his problems, and compliance with his medication regimen.  (Id. at 603).  In treatment notes from June 2010, Reyes "identified anxiety as the central problem he is working through," (id. at 579), and in treatment notes from July 2010, Reyes identified "repetitive thought process as a central cause of his rising anxiety," (id. at 577).  Throughout the summer and fall of 2010, Reyes was assessed as no danger to himself or others.  (Id. at 561, 563-64, 566, 569, 573, 576-80).  A Treatment Plan Review dated June 30, 2010, contained a functional assessment indicating that he had severe impairment in several domains, but Reyes was assigned a GAF of 55.  (Id. at 625-26).

During a psychiatric evaluation on August 2, 2010, Reyes was alert and cooperative and behaved and dressed appropriately.  (Id. at 589).  His speech and thought processes were normal and appropriate, no thought disorders were evident, and Reyes denied suicidal thoughts.  (Id. at 590).   He showed good abstract thought and fair cognitive ability.  (Id. at 591).  He again reported that at the age of three or four, he was molested by a twelve year-old girl.  (Id. at 588).  Reyes was diagnosed with mood disorder NOS and antisocial personality traits, with a notation to rule out dysthymic disorder and bipolar disorder, and he was assigned a GAF score of 55.  (Id. at 593).

Dr. Lopez-Leon's progress notes from August 25, 2010, indicate that Reyes "[s]till feels somewhat depressed but [is] improved," is tolerating Pristiq, and is complying with his medication plan to "targe[t] mood/anxiety symptoms."  (Id. at 569). The doctor's notes from September 29, 2010, indicate that Reyes' symptoms of depression "will most likely get aggravated with interferon" treatments that he was about to begin.  (Id. at 564).  Dr. Lopez-Leon diagnosed Reyes with major depressive disorder, discontinued his prescriptions for Pristiq and Invega (which Reyes did not feel were helping), and started him on Cymbalta and Hydroxyzine.  (Id.).  During a subsequent psychiatric visit on October 6, 2010, Reyes reported "that he has been feeling better" and "sleeping a lot better."  (Id. at 559).  Dr. Lopez-Leon indicated that Reyes showed "[i]mproved motivation and mood [and] less irritability," and was "well related," with a stable affect and mood  (Id.).  The doctor also noted that Reyes had "suicide risk factors," but was "not in imminent danger to himself or others."  (Id.).

23

In a Treatment Plan Review dated October 2010, Regina Burke, a licensed clinical social worker, found that Reyes had a moderate impairment in his interpersonal/social, educational/vocational, home management, and leisure functioning. (Id. at 617).  She diagnosed him with mood disorder NOS and antisocial personality traits, and assigned him a GAF of 50.  (Id.).  In a  Wellness Plan Report dated December 3, 2010, however, Burke indicated that Reyes was depressed by his current medical treatment, was "very ill . . . [and] isolative, [and] report[ed] paranoia, irritability [and] visual hallucinations."  (Id. at 551).  She stated that Reyes' "condition has worsened as a well known [and] established side effect of medical t[reatment]," and that he was "[u]nable to work for at least 12 months."  (Id. at 552).

In his Progress Notes for a session on January 13, 2011, Dr. Lopez-Leon noted that Reyes showed "[i]mproved symptoms," and was "happy" because the interferon treatments were working to combat his hepatitis C.  (Id. at 640).  On February 10, 2011, Dr. Lopez-Leon noted that Reyes felt that "he has been stable from his depression," but that the interferon treatments gave him flu-like symptoms and left him without energy.  (Id. at 637-38).  On March 17, 2011, Dr. Lopez-Leon noted that Reyes still had five months of interferon treatments ahead, but that Reyes was "well related, [and] pleasant and cooperative," with a "full and stable affect" and good cognition.  (Id. at 631-32).

A Treatment Review Plan dated March 3, 2011, contained findings similar to those in October 2010.  Reyes reported altered sleep, anxiety, decreased concentration

and depressed mood, he was to continue outpatient psychiatric treatment, and his goals for discharge from the program included "enroll[ing] in a training or work program or day program for rehabilitation development."  (Id. at 610-15).  His functional impairments were generally moderate, but severe in the domain of "Personal/Health Management" and extreme in the "Educational/Vocational" domain.  (Id. at 610).  His GAF score remained at 50.  (Id.).

In an August 2011 Treatment Plan Review, Reyes was assigned a GAF of 52, and his level of impairment was noted as almost entirely moderate.  (Id. at 818-24). In a psychiatric evaluation dated September 1, 2011, Dr. Lopez-Leon reported that Reyes had been "stable for the last year, with some waxing and waning of symptoms" due to his interferon treatments.  (Id. at 816).  He was well developed and well groomed, normal in his speech, casual and relaxed in his attitude, pleasant and cooperative in his behavior, and "full but easily irritable" in his affect.  (Id. at 817).  Reyes had appropriate recent and remote memory, concentration, attention, judgment and impulse control.  (Id.).  Reyes, however, still had "mood swings, irritability, and insomnia," as well as decreased sleep, appetite, and energy.  (Id. at 816-17).  He was diagnosed with major depressive disorder recurrent in partial remission, hepatitis C in remission, and assigned a GAF of 57.  (Id. at 816).  Reyes remained on Trazodone, Seroquel, Cymbalta and Hydroxyzine.  (Id.).

b.    Consultative Examinations

On August 16, 2010, Reyes saw Dr. Herb Meadow for a consultative psychiatric evaluation.  Reyes reported that he was hospitalized in 1982 "for one month

following suicidal ideation and ha[d] been in and out of psychiatric treatment since that

time." (Id. at 350). He stated that he last worked as a driver in February of 2009, but was

laid off.[15] (Id.). Reyes reported appetite fluctuation, symptoms of depression, low energy

and self-esteem, and difficulty concentrating. (Id.). Dr. Meadow noted that Reyes was

cooperative, well-groomed, and coherent, with an appropriate affect, although he had a

depressed mood. (Id. at 351). Reyes' attention, concentration, and memory skills were

intact, and he exhibited average cognitive functioning. (Id.). Dr. Meadow's diagnosis

was that Reyes had dysthymic, posttraumatic stress, and intermittent explosive disorders,

with a need to rule out bipolar disorder. (Id. at 352). Based on his assessment, Dr.

Meadow concluded that Reyes "would be able to perform all tasks necessary for

vocational functioning," and that Reyes' psychiatric problems were "not . . . significant

enough to interfere with [his] ability to function on a daily basis." (Id.).

On September 10, 2010, a non-examining agency psychiatric consultant

found that Reyes' mental impairments were not severe. The doctor's rationale for this

determination is unclear. (Id. at 429-42).

2.    Discussion

To pass muster, the ALJ's RFC analysis must "[s]et forth a logical

explanation of the effects of the symptoms, including pain, on the individual's ability to

work." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). At the outset of the analysis,

---

[15]    This account conflicts with earlier statements in which Reyes indicated he quit.
(See R. 532 ("[Reyes] reports that he left his [limo driver] job due to disagreement with his
boss."), 599).

the ALJ must "first identify the [claimant's] functional limitations or restrictions . . . on a function-by-function basis. Id. at *1. These functions include such physical abilities as standing, walking, and lifting, and mental abilities. Id. at *5. SSR 96-8p "cautions that 'a failure to first make a function-by-function assessment of the [claimant's] limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions,' which 'could lead to an incorrect use of an exertional category to find that the individual is able to do past relevant work' and 'an erroneous finding that the individual is not disabled.'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96-8p, 1996 WL 374184, at *4). Nevertheless, when an ALJ's analysis of a claimant's RFC applies the correct legal standards, affords a basis for meaningful review, and is supported by substantial evidence, there is no basis for a remand merely because the ALJ did not conduct a function-by-function review. Id. at 177.

Here, as the foregoing summary of the record shows, the suggestion that the ALJ cherry-picked the evidence is utterly baseless. Indeed, the ALJ reviewed the evidence relating to Reyes' physical and mental limitations in exhaustive detail. (See R. 17-22). He also chose not to accept some of the consultative evidence, rejecting the opinion of a psychiatrist that Reyes' mental impairment was not severe as contrary to the record. (Id. at 21). Although he did not proceed in a function-by-function manner, the ALJ carefully set forth the basis for his RFC determination, and his findings are supported by substantial evidence.

Turning first to Reyes' physical limitations , the ALJ placed "significant weight" on the opinion of Dr. Revan, who found after a physical examination that Reyes had only mild limitations with respect to walking, standing, and sitting for long periods of time.  (Id. at 19).  ALJ Scheer also noted that this finding was "not inconsistent with the other evidence of record."  (Id.).  Despite two opportunities, Reyes has yet to explain why this finding is not supported by substantial evidence.

The same holds true with respect to Reyes' mental limitations.  In determining Reyes' RFC, the ALJ placed considerable reliance on the opinion of Dr. Meadow, who found that Reyes could "perform all tasks for vocational functioning," notwithstanding his psychiatric problems.  Although Dr. Meadow was a consultant who examined Reyes on only one occasion, here again the ALJ correctly noted that there was no opinion to the contrary.  (Id. at 20, 22).  There was, of course, a period of time when Reyes' mental condition took a turn for the worse during his interferon therapy.  The ALJ nevertheless properly concluded that these side effects were only intermittently debilitating and not expected to last a full year.  (Id. at 17, 21).

Finally, although the record contains a few entries from treating sources referring to Reyes' inability to work, the determination of that issue rests with the Commissioner, who is not required to accept such conclusory statements from treating sources.  20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  Moreover, a fair reading of the record confirms that any impairments that Reyes may have had only precluded him from performing light work for relatively short periods of

28

time.  Accordingly, because there was substantial evidence to support the ALJ's RFC

determination, a remand is not warranted.

      C.     <u>ALJ's Assessment of Reyes' Credibility</u>

      Reyes last challenge concerns the ALJ's assessment of his credibility.

Reyes alleges that the ALJ failed to consider all of the factors required in a credibility

analysis and "failed to explain how [Reyes'] described daily activities translated into a

capacity to perform light or other work."  (Pl.'s Mem. at 5).

      The analysis at Step Four of the disability determination involves a two-part

inquiry.  First, the ALJ must determine whether the claimant has a medically-

determinable impairment that could reasonably be expected to produce the pain or

symptoms alleged.  <u>Sarchese v. Barnhart</u>, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at

*7 (E.D.N.Y. July 19, 2002) (citing 20 C.F.R. §§ 404.1529(b), 416.929(b) and SSR 96-

7p, 1996 WL 374186, at *2 (July 2, 1996)).  Then, if the claimant makes statements about

his symptoms that are not substantiated by the objective medical evidence, the ALJ must

make a finding as to the claimant's credibility and determine the extent to which his

symptoms truly limit his ability to perform basic work activities.  <u>Sarchese</u>, 2002 WL

1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.  Although the ALJ must "take the

claimant's reports of pain and other limitations into account, he or she is not require[d] to

accept the claimant's subjective complaints without question."  <u>Campbell v. Astrue</u>, 465

F. App'x 4, 7 (2d Cir. 2012) (internal citations and quotation marks omitted).  "Rather,

the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record.'" Id. (quoting Genier v. Astrue, 606 F.3d 46,

49 (2d Cir. 2010)).  A federal court consequently must afford great deference to the ALJ's

credibility finding so long as it is supported by substantial evidence.  Bischof v. Apfel, 65

F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see also Gernavage v. Shalala, 882 F. Supp. 1413,

1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination

because he heard plaintiff's testimony and observed his demeanor.").

> In making a credibility determination, an ALJ must consider:
>
> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, the claimant has received; (6) any other measures the claimant employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms.

Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing 20 C.F.R.

§ 404.1529(c)(3)(i)-(vii)).  The ALJ, however, need not discuss all of these factors "as

long as the decision includes precise reasoning, is supported by evidence in the case

record, and clearly indicates the weight the ALJ gave to the claimant's statements and the

reasons for that weight."  Felix v. Astrue, No. 11 Civ. 3697 (KAM), 2012 WL 3043203,

at *8 (E.D.N.Y. July 24, 2012) (citations omitted).  The ALJ therefore "has the discretion

to evaluate the credibility of a claimant and to arrive at an independent

judgment . . . regarding the true extent of the pain alleged."  Martinez v. Astrue, No. 10

Civ. 9284 (PKC), 2012 WL 4761541, at *11 (S.D.N.Y. Aug. 1, 2012) (internal quotation marks omitted).

        Here, the ALJ concluded that Reyes' "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent that they [were] inconsistent with the [ALJ's] residual functional capacity assessment."  (R. 17).  The use of this boilerplate language has been repeatedly criticized.  See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012) (characterizing it as "even worse" than earlier template language widely used by ALJs). Indeed, it puts the credibility determination after the RFC determination, which "gets things backwards."  Ramos v. Comm'r of Soc. Sec., No. 13-cv-6561 (AJN), 2015 WL 708546, at *20 (S.D.N.Y. Feb. 4, 2015) (quoting Bjornson, 671 F.3d at 645). Nevertheless, the record establishes that the basis for the ALJ's credibility analysis in this case is clear, considers Reyes' activities of daily living, and is supported by substantial evidence.

        Reyes' principal contention with respect to the ALJ's RFC finding is that his back problems rendered him totally disabled.  As the ALJ noted, however, that claim was "contradicted by the medical reports."  (R. 17).  Indeed, Reyes first reported back pain to a medical provider in late 2009, after he had left his job as a limousine driver. While his visits to doctors over the next two years confirm that he had back problems, apart from a handful of conclusory statements to the contrary, the notes of those visits do

not reflect a disabling condition.  In fact, in March 2011, when he was examined by his

own physician, Reyes was found to have a decreased range of motion, but a normal gait,

and he was able to ambulate without assistive devices and to stand on his toes and heels.

(Id. at 811-14).  Earlier, in 2010, Dr. Raven made similar findings concerning Reyes'

physical condition, in the course of concluding that he had only mild limitations.  (Id. at

354-58).

    In light of this record, the ALJ pointed to Reyes' testimony that he needed

to use a cane, (id. at 17-18), as evidence that he was less than wholly credible.  Indeed,

the ALJ observed that nobody had ever prescribed a cane for Reyes, who himself had told

a disability analyst that he needed it only when walking long distances or climbing "a lot

of" stairs.  (Id. at 17 (citing id. at 182) (emphasis added)).  The ALJ also noted that Reyes

had reported to his medical providers during the relevant time period that he was "lifting

weights" and would be traveling by airplane, (id. at 15), two activities that arguably were

inconsistent with his claims of being totally unable to work.

    Finally the ALJ also pointed to discrepancies in the record concerning the

date that Reyes allegedly became unable to work as a limousine driver.  At the hearing,

Reyes testified that he had stopped working in January 2009.  As the ALJ noted, he

subsequently contended that his last day of work was in January 2008, a representation

which was consistent with his original application, and which served to expand the period

for which he might receive benefits.  The difficulty with both his application and his later

attempt to salvage that date, however, was that Reyes previously had said that he worked

until 2009, both in a work history report dated June 20, 2010, and during a 2009 doctor's visit during which he also stated that he was driving sixteen hours per day.  (Id. at 13-14, 42-43, 174, 659).  In light of this record, the ALJ plainly could reasonably conclude that Reyes was lying about his onset date.  (See id. at 13-14).

Reyes' counsel takes issue with these bases for discounting Reyes' credibility, suggesting that the citation of a single reference to weight lifting, "without more[,] calls for an image of body sculpting exercise" and that the air travel might have been necessitated by "urgent family or personal need."  (Pl.'s Reply at 3).  To be sure, the ALJ could have reached a contrary conclusion regarding Reyes' credibility.  However, "[t]he fact that another adjudicator might have come to a different conclusion based on the record is not a sufficient basis to overturn the ALJ's credibility determination." Marteau v. Colvin, No. 12 C 4058, 2015 WL 639266, at *7 (N.D. Ill. Feb. 13, 2005).

ALJ Scheer gave clear reasons for his credibility determination, he considered the evidence regarding Reyes' daily living activities in the course of doing so, and the record supports his findings.  Accordingly, even though the ALJ may not have expressly discussed each of the seven factors set forth above, the rationale for his credibility assessment can be gleaned from the record and is fully supported by substantial evidence.  Reyes' objections with respect to the ALJ's adverse credibility findings consequently do not provide any basis for this Court to remand his case.

33

V.      Conclusion

    For the foregoing reasons, Reyes' motion for judgment on the pleadings, (ECF No. 20), should be denied, and the Commissioner's cross-motion, (ECF No. 25), should be granted.

VI.     Notice of Procedure for Filing Objections to this Report and Recommendation

    The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for extension of time for filing objections must be directed to Judge Pauley.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            February 25, 2015

                        _____
                        FRANK MAAS
                    United States Magistrate Judge

Copies to all counsel via ECF

34